This Court has had before it a number of equal protection challenges. In the Maldonado-Escobar case, the Gaspar-Lupercero case, the Barajas-Barajas case, this Court has denied equal protection challenges in the illegal reentry context and memoranda dispositions. We didn't always deny them. In Armstrong, we went with the defense and went all the way through an en banc, and then the Supreme Court corrected us. Exactly, Your Honor. And I am nostalgic for the pre-Supreme Court Armstrong days. But I think that this case, the case that- And all the other cases that you just referred to can't be cited to us. Exactly, Your Honor. But I would- So you're just mentioning- that was an unsight. I'm mentioning them because the government referred to them in a 28-J letter. And I would like to emphasize the distinction in the- Aren't you both wrong? We are, Your Honor. I mean, don't we have a rule that you have now both violated? And I apologize on both of our- Hopefully right there in front of everybody, two violations by both sides. I apologize on both our behalf. At least you're citing them against yourself. But, Your Honor, I think the important distinction in the case now before the Court is the third District Court erred by refusing to endorse the discovery plan proposed by Mr. Arenas-Ortiz. And specifically, the District Court erred by not authorizing a Rule 70C subpoena to state custodial facilities to produce information that would have revealed disparate impact or selective prosecution. It seems like you have to have some evidence under the Supreme Court decision in Armstrong. And it seems like you really don't have any direct evidence that the proportion of 1326 violations prosecuted who are Hispanic is different from the proportion of 1326 violators who are Hispanic. You're drawing inferences from other things like proportion of Hispanics in prison, proportion of aliens. That's the type of thing. And I had trouble seeing why one supported the other basically for the same reason Judge Walker did. Make it clear. We disagree with that characterization because we believe that the defense did in fact present some evidence of disparate prosecution. And in support of that theory, we presented three theorems to the District Court. Each one of those three theorems suggested that there was a disparate impact on Hispanic males. And I would like to emphasize a point perhaps not driven home as clearly in the briefs. It also shows a disparate impact on males versus females. In the 17-year period surveyed in the Federal Public Defender's Office, we observed only 2.6 of the illegal reentry defendants were female. That's in comparison to a state alien population of 6.2 percent that are females. Counsel, isn't there a missing step there? Wouldn't you have to show the percentage of females who have in fact illegally reentered to make that lead to the lack of prosecution? Exactly, Your Honor. And that was the purpose of the discovery plan that was submitted in response to the invitation of the District Court. But Counsel, wouldn't you have to make that showing before you were entitled to discovery? Wouldn't you have to make some preliminary showing before you were entitled to further discovery on the issue? Your Honor, we would posit that we made a sufficient preliminary showing to enable us to the first threshold level of discovery. And I would distinguish the concerns of the... So you say your showing is the fact, the mere fact of the number, the percentage of female aliens in the caseload is the preliminary showing? That is one aspect, Your Honor. There are three theorems. We also posit that there is a proxy, a reasonable inference that can be derived from the percentage of females in the state prison population. But didn't Armstrong specifically negate such an inference? I don't believe so, Your Honor. I don't believe the Armstrong decision discussed reasonable inferences that can be made. Your theory is that the segment of the population that's female should remain constant vis-a-vis the segment of the population that illegally reenters? Your Honor, I think that a reasonable proxy for the deportation element is the fact that the members in the state prison in California almost by definition have suffered an aggravated felony. It is exceedingly rare in California to be sent to a state prison facility upon the first conviction for a felony. How do we know that? When I was a district judge, I sent people to prison for the first conviction for a felony. Gee, probably close to every time. Am I supposed to just assume that in California they let them go? Your Honor, I think that there is a different practice in California versus Alaska. That fact was discussed in the briefing in the district court, was put forth as a proxy, and was never contested by the government. And I think that is a reasonable proxy. The vast majority of felonies in California are, in fact, aggravated felonies. Do we have proof of this in the record? No, Your Honor. You said it was discussed. Is there proof that pretty much all the felons in California in prison are aggravated felons? No, Your Honor. There is a discussion that was not opposed by the government. But I think, Your Honor, even in light of the court's concerns, that the other two theorems also support the threshold showing of some evidence. And I would emphasize the distinction of the policy concerns in the Supreme Court and Armstrong. For Armstrong, the court addressed Rule 16 and was concerned about the burden imposed on the federal government by revealing, for example, prosecutorial strategies. There is an important distinction here, because in this case, we saw a Rule 17C subpoena, not on the federal government, but on state custodial facilities. And we were not even allowed to proceed to the point where we issued these subpoenas and litigated a motion to quash. Counsel, the even troubles me in that. There's a real problem with allowing discovery in these cases, and that is that you take a routine criminal case, turn it into a really big deal, in terms of the time and effort that has to be put in it, deter the government from prosecuting it, and delay the trial of the case for a large number of months while the discovery goes forward. It's no trivial thing, letting discovery go forward. And it seems like your proxies are really remote. Like I'm envisioning that a whole lot more Mexicans than Chinese or East Indians or Fijians would reenter after being deported, because it's easier, it's geographically more convenient. And I would, I'm also envisioning a possibility that more males than females would, because a lot of people want to come to where you can make more money so they can send some money home to their family. It's just, you've got to have some evidence to show that these differentials in Mexicans and Fijians are the ones that are going to get selected prosecution. Your Honor, I can see that we would anticipate a higher showing of Hispanics in the Northern District of California than of non-Hispanics. And I think that sociological intuitions would support the fact that there would be a larger pool of male gender than female gender. Our complaint is it is almost exclusive. 94.5% in our 17 years of experience were Hispanic. Almost exclusively, only 40 females out of 1,550 illegal reentry prosecutions were females. Those unbelievably disparate numbers suggest that there is, in fact, selective prosecution taking place. And that is some evidence that merits this very low threshold showing for the lowest possible area of discovery, the Rule 17C subpoena, which would have no burden on the federal government in any respect. The district court invited the defense and the government invited the defense to actually interview inmates. For example, inmates with Chinese surnames, to determine whether or not they fell outside of the pool. One cannot do that unless we have the list sought in the Rule 17 subpoenas. If I may, I'd like to reserve my remaining time for rebuttal. Thank you, counsel. May it please the court, my name is Chris Dusko, I'm an assistant United States attorney, and I represent the United States in this case. This appeal is governed by the Supreme Court's case in Armstrong. In that case, set a two-part standard for determining whether defendants are entitled to discovery in support of a selective prosecution claim. Do you have some excuse for that 28-J letter, where you cite three cases that an express rule prohibits you from citing? Within that letter, your honor, I also cited to circuit rule 36-3B2, which allows for the citation of unpublished opinions, where a case is related to the pending case. Not related. Both the defense and the government have indicated that this case is related to, those four appeals were related to this case as defined in this court's rules. It seemed reasonable to me to point out the resolution of the case. I don't know what related means then. Pardon me? You don't know what related means? Related means cases where it's two defendants in the same district court case, or something of that nature, not just cases that involve the same principles of law. I think cases that involve the same issue are related. Oh, those, that's use of a case as precedent. Related in terms of on all fours, stare decisis applies. And that's not what related means in that rule. So what, but your interpretation, you think it does mean that if a case is on all fours, then they're related, so the rule against citation only prohibits irrelevant citation. Your honor, my interpretation of related is that, and I don't want to quibble about the definition of related, is that a case that raises the exact same issue is related. And my reading of this court circuit rule 36-3 was that citations to related cases. What cases would we be prohibiting citation of if related meant what you think it means? Your honor, the 36-3 allows citation to unpublished opinions where they're not cited for presidential value, but for the fact that they are related. It's a factual context issue. I thought it would be useful for this panel to know that the cases that defendant and I had both cited as being related to this court had been resolved. I thought that'd be useful for this court to know. Are they related in some way other than that the facts and the legal issues are similar? No, your honor, they're related exactly in that way. They involve the exact same motion, the exact same evidentiary record. Is that the only reason why you should not be sanctioned for violating the rule? That was my good faith interpretation of the rule, your honor. Certainly, if you'd like me to supplement my argument by going back to those rules and briefing it for your honor. We'll consider that among ourselves. I'm sorry? We will consider that among ourselves. Go ahead. Thank you, your honor. So Armstrong sets up a two part standard. The first part requires the defendant to present some evidence tending to show a discriminatory effect, and the second part requires the defendant to present some evidence showing a discriminatory intent. To meet the first prong, the defendant must make a credible showing of different treatment of similarly situated persons. And in this case, at a minimum, a person who is similarly situated is a person with a different ethnicity or a different gender who could have been prosecuted for violating section 1326. And Armstrong is quite clear that until that showing is made, that the defendant is not entitled to any discovery. Now the defendant's initial argument is that the defendant made a showing of disparate impact, but that isn't the same thing as showing different treatment of similarly situated people. In other words, merely showing that a law is enforced primarily against, or even exclusively against, a particular ethnic group or gender does not meet the Armstrong test. And that's true, because as Armstrong held, and as this court held in Turner, that kind of showing fails to take into account the sociological factors affecting the distribution of crime. Counsel, is it your argument that a defendant could never meet the burden by using statistics to show discriminatory impact? Is that your argument? No, Your Honor. Okay, I thought that's what you said. No, the statistics, if the defendant, I'm not sure I used the word statistics, but if the defendant is to show... I thought what you said was he has to show different treatment, disparate treatment. He has to show. And that he can't show that through the use of showing discriminatory impact. He cannot meet his burden merely by showing that a law has been enforced in such a way that most defendants, or all defendants, are of a particular ethnicity or a particular gender. What else would he need to show? He would have to show that people who are not of the ethnicity or gender of the defendant had violated the law at issue, here's section 1326, and were not being prosecuted. And the reason for that is that Armstrong and Turner both recognize that sociological factors affect the distribution of crime. And those cases both placed the burden on the defendant to show that a particular sociological factor was not causing the disparate impact or disparate treatment of a particular group with the enforcement of a particular law, as opposed to selective prosecution. Here the district court found that there was an obvious common sense sociological factor affecting the distribution of crime. The geography, the proximity of Mexico to California and Latin America to California. Nowhere in defendant's submission or in Dr. Sullivan's declaration was any effort made whatsoever to account for that sociological factor. So defendant's entire showing is based upon the assumption that people of different ethnicities violate section 1326 in proportion to the representation in society in general. And that's the very assumption that Armstrong rejected, and this court, after Armstrong. Not society in general, it was felons in California prisons in general. I think that's a generous reading of what Dr. Sullivan did. What he did was he said, I'm going to assume that the California state prison population mirrors the population of California with respect to ethnicity and gender. So he determined the ethnicity of the California state prison population based entirely upon census data from the entire state of California. So in effect, he did assume that the prosecution rate should be proportionate to Hispanic representation in California in general. You know, there were some other statistics thrown around here from a report or something. One was that, what is it, 98% of the deported aliens return was one of the statements, I think, in that. And also, what percentage of aliens who are deported were Hispanic? I'm sorry, I just can't get into the second part of your question. Well, there was a report that it contained a couple of statements. One was it referred to a study, although the study wasn't introduced. It was saying 98% of the aliens who are deported return. I think that figure was in there. What Dr. Sullivan did is, the declaration that's in the record is the amended Sullivan declaration. And after these initial problems were pointed out, that he failed to identify similarly situated people, what he did was amend the declaration, which bears the heading, Brahas, Brahas, and added paragraphs 10 through 12. And in paragraph 10, he referenced two documents which were downloaded from the internet. And one document, which is at record 82, it says, and I'll quote, a 1997 study of the Los Angeles County jail system found that 75% of aliens who were moved from the facility to their home country had returned to the United States within six years and returned to the criminal justice system. He also referenced a migration news article, which is at page 95 of the record, which says something to the effect, one estimate is that 98% of all illegal immigrants who are deported for committing felonies in California eventually return to California. And of those who return, 40% will commit crimes again. That same article, and the sentence that really precedes that, states that 90% of the illegal aliens in the California prison system are Mexican nationals. Those numbers don't help the analysis for a few reasons. First, they don't show what percentage of aliens in state custody have previously been deported, nor do they show the ethnicity of those aliens. So both those numbers really don't help his analysis or move the ball forward. I suppose also when you're referring to a study on the internet or something that has an estimate of numbers. Right. The foundation is fairly weak. Yeah, it's hearsay, and it hasn't been authenticated to come in as a document that an expert would reasonably rely upon. Perhaps that's why not much was made of it, really, on either side, as I understand it. That, and I just, even if you credit the statements in the studies, they don't address the correct issues. What about the female numbers? The female numbers suffer the same problems. And in fact, there was no effort to correct the female numbers like you had with the internet documents. The female numbers, again, come from the census data about the, actually, I'm not sure that's correct. But the female numbers, again, is just a representation of the number of females in state prison. However, there's been no showing that any of the females in state prison who haven't been prosecuted violated section 1326. And again, the argument there that the defendant makes is that you can infer that they've, you make a reasonable inference that they violated section 1326. But again, that's the type of inference that Armstrong and Turner prohibit this court from making. Counsel, let me just ask you, what's your response to opposing counsel's argument that because the discovery is contemplated to be conducted within state agencies, that there is no burden on the government, and therefore, it's de minimis? Well, first, I mean, the district court rejected that discovery proposal, and it's reviewed for abuse of discretion. And I read Armstrong as saying that whenever you want discovery relating to a selective prosecution claim, you have to meet the criteria that Armstrong set forward. Defendant isn't entitled to discovery based upon some unknown principle or unknown doctrine. He has to link his discovery request to some legal principle that would require the district court to grant the request. Here, the only doctrine that could be at play is his selective prosecution motion. Armstrong is the standard that addresses that issue. Defendant cites Rule 17C, but all that rule is is a rule that authorizes district courts to issue subpoenas to compel people, and in some cases, documents, to make an appearance at a particular hearing. You don't get to Rule 17C until you find that there's a need for a hearing, and you don't get to a hearing until they've met their threshold burden under Armstrong of showing that there's selective prosecution and that there's some need for an evidentiary hearing on that issue. So it's not proper to issue Rule 17 subpoenas unless they had first made a pass to Armstrong. Thank you, Your Honor. Thank you. Thank you, Counsel. The government urges this court to extend the Armstrong decision in a way that's never been done by any published opinion. For Armstrong was centrally concerned with Rule 16 and Rule 16 discovery. And in fact, at 116 Supreme Court, 1488, the Supreme Court specifically articulated the three burdens imposed on the prosecution of the federal government by granting a Rule 16 motion for discovering a selective prosecution case. In that respect, Armstrong is inapposite to the case now before this court. For much of the discovery sought in the discovery plan was from state custodial facilities, would have no impact whatsoever on the federal government, did not infringe upon Rule 16, did not ask for disclosure of the prosecutorial strategy, did not ask the prosecutor to review its files. And the defense was refused to even have the opportunity to issue these subpoenas and litigate the Rule 17 subpoena in the context of a motion to quash. Counsel, what about opposing counsel's response that, excuse me, in order to even trigger Rule 17 that you have to make the threshold showing that's required under Armstrong? So you're sort of going in the circle in terms of avoiding that requirement. I agree that the rationale of the selective prosecution litigation is circular. But I think it's circular in such a way that the defense will always be precluded from making a showing imposing an insupportable burden, a burden which is prohibited in Armstrong. For what we sought in this case was simply a list of aliens that we could pursue further investigation of by seeking to see whether they'd been deported or not. It is the lowest possible threshold of discovery necessary to identify other aliens. And in that pursuit, we were denied. That denial, we would posit, was error. And we would suggest that this court remand this case, if for no other reason, for the limited basis of authorizing the Rule 17C subpoenas for state custodial facilities to allow us to identify other inmates with ethnic surnames other than Hispanic and pursue further investigation to see if they, in fact, were similarly situated. Thank you, Counsel. Thank you. United States v. Uranus Ortiz is submitted.
judges: Canby, Kleinfeld, Rawlinson